**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **RONALD CHANDLER, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **Civil Action No.  7:19-cv-00014-O** |
| | § | |
| **PHOENIX SERVICES, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants Phoenix Services, LLC's and Mark H. Fisher's Motion to Dismiss (ECF No. 25), filed August 5, 2019; Plaintiffs Ronald Chandler's, Chandler Manufacturing, LLC's, Newco Enterprises, LLC's, and Supertherm Heating Services, LLC's Response (ECF No. 26), filed August 14, 2019; and Defendants' Reply (ECF No. 27), filed August 28, 2019. Having reviewed the motion, briefing, and applicable law, the Court finds that Defendants' motion should be and is hereby **GRANTED in part** and **DENIED in part**.

## I.    FACTUAL BACKGROUND[1]

The enforcement of United States Patent No. 8,171,993 (the "'993 Patent") is "at the heart" of both this antitrust litigation brought by Ronald Chandler, Chandler Manufacturing, LLC, Newco Enterprises, LLC, and Supertherm Heating Services, LLC (collectively, the "Chandler Plaintiffs") against Phoenix Services, LLC ("Phoenix") and Phoenix CEO Mark H. Fisher ("Fisher") and several related patent-infringement suits initiated by Heat On-The-Fly, LLC ("HOTF"), a Phoenix subsidiary. First Am. Compl. ¶ 11, ECF No. 23. After years of patent-infringement litigation, the

---

[1] This summary of facts is taken from the First Amended Complaint. *See* ECF No. 23. At the 12(b)(6) stage, these facts are taken as true and viewed in the light most favorable to the plaintiffs. *Cf. Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002) ("Because we review here a decision granting respondent's motion to dismiss, we must accept as true all of the factual allegations contained in the complaint.").

Federal Circuit held that HOTF asserted its '993 Patent in bad faith and the '993 Patent is unenforceable due to inequitable conduct. *Id.* at ¶¶ 1, 18. The question now before this Court is whether the Chandler Plaintiffs have pleaded facts sufficient to state claims against the Phoenix Defendants for antitrust liability on the basis of (1) *Walker Process* patent fraud or (2) sham patent litigation.

## A. Patent Litigation

Heat On-The-Fly founder Ransom Mark Hefley invented the '993 Patent—entitled "Water Heating Apparatus for Continuous Heated Water Flow and Method for Use in Hydraulic Fracturing"—to heat water "on demand or inline during the fracing process, instead of using preheated water in large standing tanks," or, as HOTF puts it, to heat water "on-the-fly." *Id.* at ¶ 11; *see also id.* at ¶ 25. Prior to filing a patent application on September 18, 2009, "Hefley and his companies performed on-the-fly heating of water on at least 61 frac jobs using the system described in the '993 Patent application" and "collected over $1.8 million for those heat-on-the-fly services." *Id.* at ¶ 12. Hefley did not disclose any of these 61 prior frac jobs to the Patent and Trademark Office ("PTO"), despite knowing that the PTO's "on-sale bar" required him to do so. *Id.* On May 8, 2012, the PTO approved the '993 Patent. *Id.*

Once the '993 Patent was approved, HOTF began to enforce it against the Chandler Plaintiffs and other competitors. *See id.* at ¶¶ 13–14. One non-party competitor alleged that HOTF interfered with its prospective business relationship by calling that competitor's customer, claiming the competitor's water heaters infringed the '993 Patent, and suggesting an infringement suit. *Id.* at ¶ 13. On another occasion, HOTF threatened Plaintiff Supertherm Heating Services, LLC's customers with patent-infringement allegations, which led its largest customer to "greatly

reduce[] the number of in-line frac water heating jobs awarded." *Id.* at ¶ 14. "Ultimately, Supertherm's business was harmed to the point where it suspended operations . . . ." *Id.*

HOTF eventually brought its claims to court. *See id.* In an earlier suit before the Northern District of Texas, HOTF sued the Chandler Plaintiffs for infringing the '993 Patent. *Id.* at ¶ 1. The Northern District stayed litigation pending the outcome of an earlier-filed suit in the District of North Dakota, in which HOTF alleged a competitor and the competitor's contractor also infringed the '993 Patent. *Id.* at ¶¶ 1, 15. "The jury in the North Dakota litigation found that HOTF asserted the '993 Patent in 'bad faith[,'] and the district court in North Dakota found the '993 Patent unenforceable due to inequitable conduct." *Id.* at ¶ 1; *see also id.* at ¶¶ 16–17. On appeal, the Federal Circuit affirmed the North Dakota district court's declaratory judgment on both issues. *Id.* at ¶¶ 1, 18 (citing *Energy Heating LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1296, 1304 (Fed. Cir. 2018)).

### B. Antitrust Litigation

Following the Federal Circuit's ruling in the patent litigation, the Chandler Plaintiffs filed this antitrust suit against Phoenix, the owner and parent company of HOTF. Compl. ¶ 2, ECF No. 1. The Chandler Plaintiffs later amended their complaint to also assert antitrust claims against Fisher, the Phoenix CEO and sole employee of HOTF. First Am. Compl. ¶ 1, ECF No. 23. In light of the Federal Circuit's affirmance that, as a matter of patent law, the '993 Patent was submitted in bad faith and unenforceable due to inequitable conduct, the Chandler Plaintiffs submit that Phoenix is liable for attempted monopolization due to its own "act[s] to encourage the anticompetitive acts of HOTF with respect to the '993 Patent" and for "the anticompetitive conduct of its subsidiary, HOTF, pursuant to the Sherman Act, 15 U.S.C. § 2." *Id.* at ¶ 21. They submit

that Fisher, as an officer of a defendant company, is also individually liable for his involvement in the patent litigation and knowledge of Phoenix's anticompetitive acts. *See id.* at ¶¶ 1, 25.

### 1. Alleged Anticompetitive Conduct

Since the '993 Patent was approved in 2012, HOTF has "made infringement claims as to the '993 Patent in litigation against many participants in th[e] relevant market [for in-line frac water heating,] including, but not limited to: Energy Heating, LLC, Rocky Mountain Oilfield Services, LLC, Marathon Oil Corp., Enservco, and the Chandler P[laintiffs]." *Id.* at ¶ 18. These claims have included informal communications with its competitors' customers, as well as several lawsuits. *See id.* at ¶¶ 13–15.

Additionally, "while the inequitable conduct finding as to the '993 Patent was on appeal to the Federal Circuit, . . . [Phoenix] directly encourage[ed] HOTF in fraudulently asserting the '993 Patent against the 'on the fly' frac water heating market." *Id.* at ¶ 19. Specifically, Phoenix "modified its website in early 2018 to threaten the market by stating that a patent license is required to practice the method of heating 'on-the-fly[,'] and referencing the '993 Patent." *Id.* The statements remained on Phoenix's website following both the Federal Circuit's affirmance of the district court's declaratory judgment against HOTF and the passing of the deadline to petition the Supreme Court for certiorari. *Id.* Further, Phoenix has continued to "seek[] licenses from the 'on the fly' frac water heating market participants knowing the '993 Patent has been adjudicated as unenforceable pursuant to a final and non-appealable judgment." *Id.*

As HOTF's sole employee, Fisher "has been in daily control" of the stayed patent-infringement suit HOTF filed in this Court against the Chandler parties. *Id.* at ¶ 25; *see also id.* at ¶ 1. When asked who was responsible for "enforcing the licenses, the patent license, the trademark, the patent, the technology stuff" during the North Dakota patent-infringement litigation, Hefley

answered that "[a]s far as [he] kn[ew,] Mark Fisher [wa]s in charge of everything that has to do with Heat On-The-Fly." *Id.* at ¶ 25. Hefley also said he spoke to Fisher about once per week. *Id.* As Phoenix CEO, Fisher "would also have been aware of the licensing offers for the '993 Patent" posted on Phoenix's website. *Id.*

    2.  <u>Alleged Market Share</u>

Throughout the patent litigation, HOTF maintained that most in-line frac water heating nationwide was performed using HOTF's patented invention. *Id.* at ¶ 18. In 2015, for purposes of the PTO's reexamination of the '993 Patent, HOTF submitted two declarations regarding its coverage. *Id.* Declarant James D. Cole provided an analysis of the "in-line frac water heating market" as of 2013, which included the following:

> 19) I, with the assistance of the licensees of the patent in 2013, broke up the 2013 US market for water heating for use in horizontal fracing of shale formations into 7 major markets, as follows:
>
> 20) Appalachian . . .
>
> 21) Mid-Continent . . .
>
> 22) East Texas, North Louisiana market . . .
>
> 23) Kansas . . .
>
> 24) Colorado . . .
>
> 25) Wyoming . . .
>
> 26) North Dakota and Montana . . .
>
> 27) By my calculations, about $355-365 million was spent on frac water heating in these 7 major markets, and of this about $225-235 million was performed using the invention claimed in claim 1 of US Patent No, 8,171,993. **Thus, an estimated 62-66% of all frac water heating (by dollar volume) in these 7 major markets in the US was performed in 2013 using the invention claimed in claim 1 of US Patent No. 8,171,993.** Of this, about 23-24% (about $53 million) was performed by licensees of US Patent No. 8,171,993 and the majority was performed by non-licensed heating companies. In 2013, the about $53 million in frac water heating

using the invention claimed in claim 1 of US Patent No. 8,171,993 performed by licensees of US Patent No. 8,171,993 represented about 15% of the total revenue for frac water heating in these 7 major markets.

*Id.* (emphasis added). But speaking of the then-current April 2015 market, Cole testified that he was "unaware of any water heating process currently in use for heating water continuously and on demand in fracing operations which is not covered by claim 1 of US Patent No. 8,171,993." *Id.* In a second declaration dated April 2015, declarant James Kirk Plumlee testified, "[t]here is simply no practical way to frack the larger jobs nowadays without using the patented method. . . . I see other companies heating water for use in fracking in our market area (primarily Central and Eastern Texas). Nearly everyone[,] especially on large frac jobs[,] is heating using the patented method." *Id.*

### 3. Claims Asserted

Based on the aforementioned facts alleged in their First Amended Complaint and the Federal Circuit's ruling in the patent-infringement suit, the Chandler Plaintiffs assert that Phoenix and Fisher (collectively, the "Phoenix Defendants") committed Sherman Act § 2 attempted-monopolization violations amounting to either (1) *Walker Process* patent fraud or (2) sham patent litigation.

## II. LEGAL STANDARD

### A. Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 8(a) requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy

Rule 8(a), the defendant may file a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court may not accept legal conclusions as true, and only a complaint that states a plausible claim for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

"Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may also consider documents that a defendant attaches to a motion to dismiss if

they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

**B. Patent-Antitrust Liability**

To establish antitrust liability based on the unlawful enforcement of a patent, a claimant must either (1) "prove that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process*," or (2) "demonstrate that the infringement suit was a mere sham." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000) (internal citation omitted).

    1. *Walker Process* Patent Fraud

The Supreme Court in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corporation*, 382 U.S. 172 (1965) established that "the enforcement of a patent procured by fraud on the Patent Office may be violative of [§] 2 of the Sherman Act." *Id.* at 174. To succeed on a *Walker Process* claim, a plaintiff must prove two elements: (1) "the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced that patent with knowledge of the fraudulent procurement" and (2) the plaintiff can satisfy "all other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). As to the first element, the Supreme Court "made clear that the invalidity of the patent [i]s not sufficient; a showing of intentional fraud in its procurement [i]s required." *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012). As to the second, "the Court incorporated the rules of antitrust law generally. As Justice Harlan stated in his concurring opinion, 'as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play.'" *Id.* (citing *Walker Process*, 382 U.S. at 180 (Harlan, J., concurring)).

8

Under § 2 of the Sherman Act, a defendant may be liable for monopolization, attempt to monopolize, or conspiracy to monopolize. 15 U.S.C. § 2. When the plaintiff alleges monopolization, a court must "focus on the harm done, in the form of a monopolization which the defendant willfully creates or maintains," but when a plaintiff alleges attempted monopolization, the court must instead "focus on the harm that potentially *might* have been caused by the conduct in light of the state of the market." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000) (emphasis added). "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "The first element considers the conduct, the second looks to the motivation behind the conduct, and the third looks to the defendant's market power and commensurate ability to lessen or destroy competition in that market." *Taylor Publ'g Co.*, 216 F.3d at 474 (internal citation omitted). When the third, "dangerous probability" element is at issue, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.

2. Sham Patent Litigation

A plaintiff may also base its claim for antitrust liability on an allegation that defendant engaged in sham patent litigation. *Cf. Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*, 762 F.3d 1338, 1343 (Fed. Cir. 2014) (noting that while, "[a] party is ordinarily exempt from antitrust liability for bringing a lawsuit against a competitor . . . [t]here is a recognized exception . . . for 'sham litigation'" (internal citation omitted)). Indeed, antitrust law precludes a purported patent owner from "bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed" when "the litigation is conducted for anti-competitive purposes." *C.R. Bard, Inc. v. M3*

*Sys., Inc.*, 157 F.3d 1340, 1368 (Fed Cir. 1998). In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* (*PRE*), 508 U.S. 49 (1993), the Supreme Court established the two-part test for "sham" litigation: "(1) the lawsuit must be objectively meritless such that 'no reasonable litigant could expect success on the merits' and (2) it must be found that 'the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor."'" *C.R. Bard*, 157 F.3d at 1368 (quoting *PRE*, 508 U.S. at 60). Because "[f]raud in the procurement of a patent is governed by *Walker Process* . . . the complainant 'must still prove a substantive antitrust violation.'" *Id.* (quoting *PRE*, 508 U.S. at 61).

### C. Individual Antitrust Liability

"[A] corporate officer or director can be held personally liable for damages arising out of an anti-trust violation where he participated in the unlawful acts, or where he acquiesced or ratified the actions of other officers or agents of the corporation which were in violation of the anti-trust law." *MVConnect, LLC v. Recovery Database Network, Inc.*, No. 3:10-CV-1948, 2011 WL 13128799, at *10 (N.D. Tex. May 27, 2011) (internal citation omitted). The "essential principle" necessary to hold a director or officer individually liable for a company's alleged violation is the director's or officer's "direct, personal participation." *Id.* Accordingly, to survive a motion to dismiss a claim for individual liability based on an antitrust violation, a plaintiff must plead "factual allegations of some sort of conscious wrongdoing by [an] officer on the corporation's behalf" and that the officer had "some direct role" in the alleged violation. *Id.* at *9 (citing *In re Morrison*, 555 F.3d 473, 481 (5th Cir. 2009); *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)).

## III.     ANALYSIS

The Phoenix Defendants move to dismiss the Chandler Plaintiffs' claims on "two narrow and specific grounds." Defs.' Reply 1 , ECF No. 27. First, the Phoenix Defendants ask the Court to dismiss all counts because the Chandler Plaintiffs "have not sufficiently alleged that there was a dangerous probability of success in achieving market power," as necessary to claim attempted monopolization. *Id.*; *see also* Defs.' Mot. Dismiss 4–8, ECF No. 25. Second, the Phoenix Defendants ask the Court to dismiss all counts against Fisher because the Chandler Plaintiffs "have not sufficiently alleged facts that state a claim that would subject Mr. Fisher to individual antitrust liability." Defs.' Reply 1, ECF No. 27; *see also* Defs.' Mot. Dismiss 8–10, ECF No. 25. The Court addresses each contention in turn.

### A.  Dangerous Probability of Achieving Monopoly Power

To proceed with a claim for *Walker Process* patent fraud or sham patent litigation, a plaintiff must allege facts sufficient to plausibly satisfy all factors of a Sherman Act claim. *See TransWeb*, 812 F.3d at 1306; *C.R. Bard*, 157 F.3d at 1368.[2] Because their *Walker Process* claim

---

[2] Typically, in a patent-antitrust case, the Federal Circuit's law applies to the patent issues, while the regional circuit's law applies to the antitrust issues. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1067 (Fed Cir. 1998). In *Nobelpharma*, the Federal Circuit set out the rule: "As a general proposition, when reviewing a district court's judgment involving federal antitrust law, we are guided by the law of the regional circuit in which that district court sits. However, we apply our own law, not regional circuit law, to resolve issues that clearly involve our own jurisdiction." *Id.* The Federal Circuit reasoned that, because most cases involving fraudulently procured patents will be appealed to the Federal Circuit, it is "in the best position to create a uniform body of federal law on this subject and thereby avoid the danger of confusion [that] might be enhanced if [it] were to embark on an effort to interpret the laws of the regional circuits." *Id.* (internal citation omitted). The Federal Circuit's conclusion "applies equally to all antitrust claims premised on the bringing of a patent infringement suit," but regional-circuit law continues to apply to "issues involving other elements of antitrust law such as relevant market, market power, damages, etc., as those issues are not unique to patent law." *Id.*

Following this rule, the Court "applies the law of the regional circuit as to market definition." *TransWeb*, 812 F.3d at 1307. Ordinarily, the Court would also apply Fifth Circuit law to the "dangerous probability" element. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487–88 (5th Cir. 1984). But in this case, the effect of enforcing the patent is inextricable from the market share that HOTF could occupy. As the Fifth Circuit recognized in *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429 (5th Cir. 2019), "the

is based on the Phoenix Defendants' alleged attempted monopolization, the Chandler Plaintiffs "must show: '(1) that the [Phoenix Defendants] ha[ve] engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016) (quoting *Spectrum Sports*, 506 U.S. at 456).

The Phoenix Defendants argue that the Chandler Plaintiffs have not satisfied the third element of the attempted-monopolization claim, as they allegedly failed to plead facts sufficient to support a finding that there was a "dangerous probability" of HOTF successfully obtaining monopoly power. Defs.' Mot. Dismiss 5, ECF No. 25. This argument relies on their underlying contention that the pleaded facts demonstrate the Phoenix Defendants' market share is "legally insufficient" to support a claim of attempted monopolization. *Id.* at 6. The Phoenix Defendants state that the allegations, "if accepted as true, show that HOTF and its licensees possessed only 14.5% of the market for 'frac water heating'" and "even if the market were for 'in-line frac water heating,' as Plaintiffs allege, HOTF's market share was only 23%." *Id.* (citing First Am. Compl. ¶ 18, ECF No. 23). They quote the Fifth Circuit's opinion in *Domed Stadium Hotel*, in which the circuit did not identify "a market share percentage that of itself rises to the level of legal significance," but "note[d] that a share of less than the fifty percent generally required for actual monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present." 732 F.2d at 490; *see also* Defs.' Mot. Dismiss 7,

last *Walker Process* case decided by the Fifth Circuit was in 1975, before the Federal Circuit was created." *Id.* at 435. Thus, our regional circuit precedent offers little guidance on how assertion of a patent may impact a party's likelihood of achieving monopoly power and the resulting impact on the market. Accordingly, the Court applies Federal Circuit law to this issue as needed.

ECF No. 25 (citing several case examples in support). And because the Phoenix Defendants opine that the Chandler Plaintiffs "do not plead any facts regarding the nature and characteristics of the market in this case or the effect of Phoenix's alleged conduct on the market," they conclude that the Chandler Plaintiffs "do not plead sufficient facts to support their attempted monopolization claims." Defs.' Mot. Dismiss 7, ECF No. 25.

Importantly, because the Chandler Plaintiffs raise an *attempted*-monopolization claim, not a monopolization claim, the Court need not concern itself with the Phoenix Defendants' success in achieving monopoly power; rather, it must "focus on the harm that potentially *might* have been caused by the conduct in light of the state of the market." *Taylor Publ'g Co.*, 216 F.3d at 474 (emphasis added). To determine the harm the Phoenix Defendants might have caused, the Court must "appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. . . . [W]ithout a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Spectrum Sports*, 506 U.S. at 455–56 (internal citation omitted). "The relevant market has both geographical dimensions and product dimensions." *Domed Stadium Hotel*, 732 F.2d at 487. And "antitrust law recognizes that economically significant submarkets may exist which themselves constitute relevant product markets." *Id.* at 487.

"[E]vidence of a defendant's market share is the principal tool used to determine the existence of monopoly power." *Dimmitt Agric. Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 521 (5th Cir. 1982). But "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (Sotomayor, J.) (collecting cases); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481–82 (1992) ("The relevant market for antitrust

purposes is determined by the choices available to [consumers]. . . . The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." (internal citations omitted)). The Chandler Plaintiffs claim that the Phoenix Defendants attempted to monopolize the "market for in-line frac water heating." First Am. Compl. ¶ 18, ECF No. 23. Though the Phoenix Defendants distinguish between the "frac water heating" and "in-line frac water heating" markets, *see* Defs.' Mot. Dismiss 6, ECF No. 25, the Court ought not determine which is the "relevant market" before the parties engage in discovery. *Domed Stadium Hotel*, 732 F.2d at 487. Thus, the Court analyzes the data and deposition testimony in light of the alleged "in-line frac water heating" market, accepting all well-pleaded facts in the First Amended Complaint as true and viewing them in the light most favorable to the Chandler Plaintiffs. First Am. Compl. ¶ 18, ECF No. 23.

The Court begins with declarant Cole's data and market analysis of "the in-line frac watering [sic] heating market in the United States during 2013." First Am. Compl. ¶ 18, ECF No. 23. Though the Phoenix Defendants point the Court to the correct paragraph of the First Amended Complaint, they focus on the wrong statistics. *See* Defs.' Mot. Dismiss 6, ECF No. 25. Notably, the Chandler Plaintiffs do not correct them. *See* Pls.' Resp. 10, ECF No. 26 ("Defendants argue that a market share of 23-24% is legally insufficient to allege a dangerous probability of success . . . Defendants are wrong."). But the Court highlights this error because the distinction is key to the dangerous-probability analysis. The relevant portion of Cole's data and analysis states:

> 27) By my calculations, about $355-365 million was spent on frac water heating in these 7 major markets, and of this about $225-235 million was performed using the invention claimed in claim 1 of US Patent No, 8,171,993. **Thus, an estimated 62-66% of all frac water heating (by dollar volume) in these 7 major markets in the US was performed in 2013 using the invention claimed in claim 1 of US Patent No. 8,171,993.** Of this, about 23-24% (about $53 million) was performed by licensees of US Patent No. 8,171,993 and the majority was performed by non-licensed heating companies. In 2013, the about $53 million in frac water heating

> using the invention claimed in claim 1 of US Patent No. 8,171,993 performed by licensees of US Patent No. 8,171,993 represented about 15% of the total revenue for frac water heating in these 7 major markets.

First Am. Compl. ¶ 18, ECF No. 23 (emphasis added). The 23% figure the Phoenix Defendants rely on represents the market share that HOTF and their licensees *actually occupied* in the in-line frac water-heating market, not the market share they *could occupy* through the allegedly fraudulent enforcement of the '993 Patent. The more representative figure from the data pleaded is 62–66%— the percentage "performed using the invention claimed in claim 1 of [the '993 Patent]." *Id.* Though "about 23-24% (about $53 million) was performed by licensees . . . the majority was performed by non-licensed heating companies." *Id.* By taking actions like calling non-licensed competitors' customers to assert the '993 Patent, initiating lawsuits for the infringement of the '993 Patent, and posting the '993 Patent on Phoenix's website, HOTF could plausibly occupy the full 62–66% of the market that "us[ed] the invention claimed in claim 1 of [the '993 Patent]." *Id.*; *see also id.* at ¶¶ 15–21.

But that was 2013. The First Amended Complaint also contains factual allegations supporting its assertion that, as of 2015, "HOTF was essentially claiming 100% of this market." Pls.' Resp. 12, ECF No. 26. Specifically, the Chandler Plaintiffs cite two declarations HOTF submitted to the PTO. First Am. Compl. ¶ 18, ECF No. 23. In addition to his data and analysis of the 2013 market, Cole testified that, as of April 9, 2015, he was "unaware of any water heating process currently in use for heating water continuously and on demand in fracing operations which [wa]s not covered by claim 1 of US Patent No. 8,171,993." *Id.* Plumlee, another declarant, stated: "There is simply no practical way to frac[] the larger jobs nowadays without using the patented method. . . . Nearly everyone[,] especially on large frac jobs[,] is heating using the patented method." *Id.* Given the Chandler Plaintiffs have pleaded facts sufficient to allege the Phoenix

Defendants could have occupied 62-66% of the in-line frac water-heating market in 2013 and 100% of that market in 2015, the Court rejects the Phoenix Defendants' argument that the pleaded market share is less than 50% and therefore "legally insufficient." Defs.' Mot. Dismiss 6, ECF No. 25.

Moreover, the Court concludes that the Chandler Plaintiffs have pleaded facts sufficient to address other market factors, "such as concentration of the market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market." *Domed Stadium Hotel*, 732 F.2d at 490. The Chandler Plaintiffs claim that the patent itself is "a perfect example of a barrier to entry." Pls.' Resp. 12, ECF No. 26. And the Phoenix Defendants correctly reply that "the existence of a patent cannot satisfy the Plaintiffs' pleading requirement" as "'[a] patent does not of itself establish a presumption of market power in the antitrust sense.'" Defs.' Reply 6, ECF No. 27 (quoting *Abbott Labs. v. Brennan*, 952 F.2d 1346, 1354 (Fed. Cir. 1991)). Indeed, because "[t]he commercial advantage gained by new technology and its statutory protection by patent do not convert the possessor thereof into a prohibited monopolist[, t]he patent right must be 'coupled with violations of § 2[,'] and the elements of violation of 15 U.S.C. § 2 must be met.'" *Abbott Labs.*, 952 F.2d at 1354 (quoting *Walker Process*, 382 U.S. at 177–78). But if, as the Chandler Plaintiffs plausibly claim, the patent is fraudulent under *Walker Process*, then monopolistic effects stemming from its enforcement may give rise to antitrust liability.

The purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports*, 506 U.S. at 458. Thus, "[t]he law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest." *Id.* Likewise, "[a] patent by its very

nature is affected with a public interest." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816 (1945). "As recognized by the Constitution," a patent is a "special privilege designed to serve the public purpose of promoting the 'Progress of Science and useful Arts.'" *Id.* (quoting U.S. CONST. art I, § 8, cl. 8). And "[a]t the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market." *Id.* Therefore, the Supreme Court has recognized that "[t]he far-reaching social and economic consequences of a patent . . . give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." *Walker Process*, 382 U.S. at 177 (quoting *Precision Instrument Mfg.*, 324 U.S. at 816).

The enforcement of a patent infected by fraud or other inequitable conduct can "undermine both the patent system and the competitive marketplace." Christopher R. Leslie, *Antitrust, Inequitable Conduct, and the Intent to Deceive the Patent Office*, 1 UC IRVINE L. REV. 323, 325 (2011). "The Federal Trade Commission (FTC) has noted that improperly awarded patents may distort firms' research choices and influence them to shun whole areas of [research-and-development] activity.'" *Id.* (internal quotation marks omitted) (citing U.S. FED. TRADE COMM'N, TO PROMOTE INNOVATION: THE PROPER BALANCE OF COMPETITION AND PATENT LAW AND POLICY (2003)). And "[e]ven when other firms know or suspect [a] patent of being invalid," its enforcement can "raise entry costs and delay market entry, deter customers and business partners from contracting with new entrants, cause consumers to pay artificially inflated prices, and hurt innovation." *Id.*

The Chandler Plaintiffs need not explicitly address the *Domed Stadium Hotel* factors in their First Amended Complaint to plausibly tie the enforcement of a fraudulently obtained patent

to these deleterious market effects. Accordingly, the 2013 market analysis, 2015 testimonies, and plausible market effects all support the Court's conclusion: The Chandler Plaintiffs' factual allegations are sufficient to allege that, based on HOTF's and Phoenix's assertion of the '993 Patent against non-licensed competitors, there was a "dangerous probability" HOTF could achieve monopoly power in the in-line frac water-heating market. The Court **DENIES** the Phoenix Defendants' Motion to Dismiss the attempted monopolization claims on this basis.

### B. Individual Antitrust Liability

The Phoenix Defendants also assert that the Chandler Plaintiffs fail to state any claim against Fisher, arguing they failed to plead sufficient facts to establish that Fisher played a "direct role" in the attempted monopolization or had a "specific intent to monopolize the market." Defs.' Mot. Dismiss 9, ECF No. 25 (internal citation omitted). They first critique the Chandler Plaintiffs' reliance on Sixth Circuit and Northern District of California precedent, which suggest that Fisher could be liable for merely "'exert[ing] his influence to shape corporate intentions regarding enforcement of the '993 Patent.'" *Id.* at 8 (quoting First Am. Compl. ¶ 25, ECF No. 23 (citing *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F. Supp. 841 (N.D. Cal. 1979)). Instead, the Phoenix Defendants point the Court to its own prior ruling, the application of which would require the Chandler Plaintiffs to plead "factual allegations of some sort of conscious wrongdoing" and "direct, personal participation" by Fisher. *Id.* at 9 (quoting *MVConnect,* 2011 WL 13128799, at *9–10).

Having considered the parties' dispute regarding the applicable test for individual antitrust liability, the Court agrees with the Phoenix Defendants: The Chandler Parties must allege that Fisher had a direct role in the attempted monopolization. The Court follows its reasoning from

*MVConnect*, 2011 WL 13128799. In *MVConnect*, this Court addressed a motion to dismiss several antitrust claims based on the defendants' contention that the plaintiffs "ha[d] not sufficiently pleaded facts that would demonstrate their individual liability." *Id.* at *9. The Court first noted, "[a]s a general matter, it is possible for individuals to be held liable under the Sherman Act." *Id.* (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 n.15 (1984) (noting that the Sherman Act provides for liability of both individuals and corporations)). Then, relying on a Fifth Circuit ruling in the bankruptcy context, the Court stated that "Fifth Circuit law appears to hold that a corporate officer must have some direct role in the conspiracy"[3] for that officer to be held individually liable. *Id.* (citing *In re Morrison*, 555 F.3d at 481). It added that "previous cases addressing the issue of officer or director liability" required "factual allegations of some sort of conscious wrongdoing by that officer on the corporation's behalf." *Id.* (citing *In re Morrison*, 55 F.3d at 481; *Mozingo*, 752 F.2d at 174). Accordingly, the Court concluded, "a corporate officer or director can be held personally liable for damages arising out of an anti-trust violation where he participated in the unlawful acts." *Id.* at 10 (internal citation omitted). Because the plaintiffs there did not "allege[] any facts regarding [the officers'] personal participation," the Court dismissed the antitrust claims for individual liability. *Id.*

---

[3] The Chandler Plaintiffs take issue with the phrase "in the conspiracy." *See* Pls.' Resp. 15, ECF No. 26. They state that "[t]he quotes from the *MV Connect* [sic] case are specific to antitrust 'conspiracy' claims, which is not an antitrust claim applicable in the instant case." *Id.* The Court first notes that this statement is inaccurate. In *MVConnect*, the defendants moved to dismiss several claims, including "conspiracy to violate Section I of the Sherman Act (Count I), monopolization and attempted monopolization under Section 2 of the Sherman [Act] (Counts II and III), [and] conspiracy to monopolize under Section 2 (Count IV)." 2011 WL 13128799, at *3. Though the Court repeatedly referenced the individual officers' alleged involvement in the "conspiracy," its analysis ultimately led to the dismissal of several claims against the officers, including those claims for attempted monopolization. *See id.* at *9–10. But regardless, the Chandler Plaintiffs provide no justification for divining a "required test" from decades-old Sixth Circuit and Northern District of California opinions. *See* Pls.' Resp. 15, ECF No. 26 (citing nonbinding cases from the 1970s and 80s). Accordingly, the Court finds the Fifth Circuit's opinions in *In re Morrison*, 55 F.3d 473 and *Mozingo*, 752 F.2d 168—as applied in *MVConnect*, 2011 WL 13128799—provide the most appropriate test for individual officer liability in the antitrust context.

Here, however, the Chandler Plaintiffs have alleged such facts—at least with regard to Fisher's involvement as the "sole employee of HOTF."[4] First Am. Compl. ¶ 1, ECF No. 23. The Chandler Plaintiffs allege that Fisher "was responsible for maintaining the [patent-infringement] litigation" HOTF initiated against them. *Id.* They also quote a deposition from the North Dakota litigation, in which Hefley—the '993 Patent inventor and HOTF founder—was asked who was responsible for enforcing the '993 Patent. Hefley testified that "[a]s far as [he] kn[ew,] Mark Fisher [wa]s in charge of everything that has to do with Heat On-The-Fly." *Id.* at ¶ 25. Taking these facts as true, the Court finds that they are sufficient to state a claim regarding Fisher's "direct role" and "conscious wrongdoing" on behalf of HOTF. *MVConnect*, 2011 WL 13128799, at *9.

The Phoenix Defendants also argue that the Chandler Plaintiffs "fail to plead that Defendant Fisher had a specific intent to monopolize the market or any facts that would support that conclusion." Defs.' Mot. Dismiss. 9, ECF No. 25. They say Fisher cannot be held responsible for the patent-infringement litigation because he had no affiliation with HOTF when it initiated

---

[4] Notably, the Chandler Plaintiffs state that "the CEO of Phoenix Services, Mark H. Fisher, also runs HOTF, and on information and belief is the sole employee of HOTF." First Am. Compl. ¶ 1, ECF No. 23. "Although there is no express authorization in the federal rules for pleading on information and belief, allegations in this form have been held to be permissible, even after the *Twombly* and *Iqbal* decisions." Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1224 (2d ed. 1990) (emphasis added). In the Fifth Circuit, "'information and belief' pleadings are generally deemed permissible . . . especially in cases in which the information is more accessible to the defendant." *Johnson v. Johnson*, 385 F.3d 503, 531, n.19 (5th Cir. 2004); *see also Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross and Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) [hereinafter *Innova*] ("underscor[ing] the principle that when discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint").

Since the Chandler Plaintiffs assert that Fisher runs HOTF and was responsible for maintaining the patent-infringement litigation, their factual allegation that Fisher is the sole employee of HOTF appears to be "'based on factual information that makes the inference of culpability plausible.'" *Innova*, 892 F.3d at 730 (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted)). And while the Phoenix Plaintiffs may not have access to HOTF's employment data, surely Phoenix—HOTF's parent company—and Fisher himself know whether HOTF had or has additional employees. Because the Phoenix Defendants do not raise this issue, the Court accepts this "information and belief" pleading as true at the 12(b)(6) stage.

the suit against the Chandler Plaintiffs in 2013. *See* Defs.' Reply 5, ECF No. 27. But this diminishes his ongoing involvement in that suit and several related patent-infringement suits from 2014 to 2018. Since the Chandler Plaintiffs pleaded (1) HOTF's "specific intent" to monopolize based on their claims to enforce the '993 Patent, *see* First Am. Compl. ¶ 18, ECF No. 23, and (2) Fisher's role as the head and sole employee of HOTF, *see id.* at ¶¶ 1, 18, the Court finds that the Chandler Plaintiffs have pleaded facts that plausibly establish Fisher's intent to monopolize.

Because the Chandler Plaintiffs have pleaded facts sufficient to allege that Fisher had a direct role in the attempted monopolization and a specific intent to monopolize the in-line frac water-heating market, the Phoenix Defendants' Motion to Dismiss is **DENIED** as to the claims against Fisher regarding his individual liability for acts taken on behalf of HOTF.

Finally, the Chandler Plaintiffs allege one fact regarding Fisher's individual liability for Phoenix's actions. Specifically, they claim that "[a]s CEO of Phoenix Services, Mr. Fisher *would also have been aware* of the licensing offers for the '993 Patent on behalf of HOTF on the Phoenix Services' website." *Id.* at ¶ 25, ECF No. 23 (emphasis added). But this is a mere suggestion of what Fisher *likely knew* or *should have known*—not a factual allegation regarding his "direct role." *MVConnect*, 2011 WL 13128799, at *9. Accordingly, the Chandler Plaintiffs have not pleaded facts sufficient to state a claim for Fisher's individual liability for acts on behalf of Phoenix; the Phoenix Defendants' Motion to Dismiss is **GRANTED** as to these claims.

## IV. CONCLUSION

The Court concludes that the Chandler Plaintiffs have pleaded facts sufficient to proceed with their *Walker Process* patent fraud and sham patent litigation claims. Specifically, the Chandler Plaintiffs have alleged facts plausibly showing a dangerous probability that HOTF would achieve monopoly power in the in-line frac water-heating market, and they have alleged facts

plausibly showing Fisher may be held individually liable for the acts of HOTF. However, the Chandler Plaintiffs have not alleged facts plausibly showing Fisher may be held individually liable for the acts of Phoenix. Accordingly, the Phoenix Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**. The claims asserting Fisher's liability for Phoenix's actions are **DISMISSED with prejudice.**

**SO ORDERED** on this **17th day** of **December, 2019**.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**