**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **RONALD CHANDLER, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **Civil Action No. 7:19-cv-00014-O** |
| | § | |
| **PHOENIX SERVICES, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiffs Ronald Chandler's, Chandler Manufacturing, LLC's, Newco Enterprises, LLC's, and Supertherm Heating Services, LLC's (collectively, the "Chandler Plaintiffs") Motion for Partial Summary Judgment, Brief in Support, and Appendix in Support (ECF Nos. 61–63), filed February 13, 2020; Defendants Phoenix Services, LLC's and Mark H. Fisher's (collectively, the "Phoenix Defendants") Response, Brief in Support, and Appendix in Support (ECF Nos. 67–69), filed March 5, 2020; and the Chandler Plaintiffs' Reply (ECF No. 73), filed March 14, 2020. Also before the Court are the Phoenix Defendants' Motion for Summary Judgment, Brief in Support, and Appendix in Support (ECF Nos. 64–66), filed February 14, 2020; the Chandler Plaintiffs' Response, Brief in Support, and Appendix in Support (ECF Nos. 70–72), filed March 6, 2020; and the Phoenix Defendants' Reply and Appendix in Support (ECF Nos. 74–75), filed March 20, 2020. Having considered the motions, briefing, and applicable law, the Court **DENIES** the Chandler Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** the Phoenix Defendants' Motion for Summary Judgment.[1]

---

[1] Were the Court to reach the third and most contested Sherman Act element—dangerous probability of achieving monopoly power—it would deny both the Chandler Plaintiffs' and Phoenix Defendants' motions for summary judgment. Based on the differing market analyses of former HOTF employee James Cole ("Cole") and economic expert Allan Jacobs, a jury would need to determine whether the market was

The Chandler Plaintiffs do not have standing to bring their claims against the Phoenix Defendants. Moreover, the Chandler Plaintiffs' claims are barred by the Clayton Act's four-year statute of limitations, and no exception applies to toll the limitations period. Finally, the Chandler Plaintiffs cannot establish Phoenix's or Fisher's liability for HOTF's allegedly anticompetitive conduct. Accordingly, the Chandler Plaintiffs' claims for *Walker Process* fraud and sham patent litigation are **DISMISSED with prejudice.**

## I. FACTUAL BACKGROUND

After years of litigation regarding the validity and enforcement of United States Patent No. 8,171,993 (the "'993 Patent"), the Federal Circuit affirmed the District of North Dakota's finding that the '993 Patent is unenforceable due to patent owner Heat On-The-Fly's ("HOTF") inequitable conduct. *See Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291 (Fed. Cir. 2018). Relying on the Federal Circuit's ruling, the Chandler Plaintiffs then brought *Walker Process* fraud and sham patent litigation claims against the Phoenix Defendants. *See* First Am. Compl., ECF No. 23. The Chandler Plaintiffs allege that Phoenix and Fisher—HOTF's parent company and CEO, respectively—are liable for HOTF's and their own unlawful attempts to exploit the '993 Patent and unlawfully gain monopoly power. *See id.* To adjudicate the parties' cross motions for summary judgment, the Court must first return to "'the heart' of both this antitrust litigation . . . and several related patent-infringement suits"—the acquisition and enforcement of the '993 Patent. *Chandler v. Phoenix Servs., LLC*, 419 F. Supp. 3d 972, 977 (N.D. Tex. 2019) (quoting First. Am. Compl. ¶ 11, ECF No. 23).

---

susceptible to monopolization and, if so, whether there was a dangerous probability that HOTF would unlawfully achieve market power. *Compare* Pls.' App. Supp. Mot. Partial Summ. J. 22–29, ECF No. 63, *with* Defs.' App. Supp. Mot. Summ. J. 162–88, ECF No. 66. However, due to the Chandler Plaintiffs' lack of standing, failure to file their claims within the Clayton Act's statute of limitations, and inability to establish Phoenix's corporate liability and Fisher's individual liability, the Court need not reach the merits of the Chandler Plaintiffs' antitrust claims.

## A. HOTF Acquisition and Enforcement of the '993 Patent

In 2006, HOTF founder Ransom Mark Hefley created a fracking[2] process to heat water "on demand or inline" or, as HOTF puts it, to heat water "on-the-fly." First Am. Compl. ¶ 11, ECF No. 23. HOTF began using the process on fracking jobs Hefley claimed were "experimental." Pls.' App. Supp. Resp. 17, ECF No. 72. When, on September 18, 2009, Hefley filed an application to patent his "Water Heating Apparatus for Continuous Heated Water Flow and Method for Use in Hydraulic Fracturing," Defs.' App. Supp. Resp. 155, ECF No. 69, Hefley knew he was required to "file within one year" of inventing the process, Pls.' App. Supp. Resp. 14, ECF No. 72. *See also* 35 U.S.C. § 102. Yet, when Hefley filed the first application for the '993 Patent, he failed to disclose the sixty-one frack jobs completed more than a year earlier. *See* Defs.' Br. Supp. Mot. Summ. J. 2, ECF No 65 (citing First Am. Compl. P 11, ECF No. 23); Pls.' App. Supp. Resp. 9, 14, ECF No. 72. On May 8, 2012, the United States Patent and Trademark Office ("USPTO") approved and issued the '993 Patent. Defs.' App. Supp. Resp. 155, ECF No. 69.

During September and October of 2013, HOTF determined that at least seventeen companies were using the patented process without obtaining licenses. Pls.' App. Supp. Mot. Partial Summ. J. 80–113, ECF No. 63. HOTF sent these non-licensed companies cease-and-desist

---

[2] In previous orders, the Court has adopted the parties' use of "frac" and "fracking" as the abbreviated forms of "fracture" and "fracturing." *See, e.g.*, Mem. Op. & Order, ECF No. 44; Mem. Op. & Order, ECF No. 52. Upon further research, the Court adopts the alternative spelling of "frack." Though "frac" is more common among industry experts, most scientists and academics now use "frack." Jason Lavis, *Fracking Vs Fracing – The End of the Debate?*, DRILLERS.COM (Aug. 22, 2017), https://drillers.com/fracking-vs-fracing-end-debate/. And most persuasively, dictionaries uniformly recognize "frack" but not "frac." *See, e.g.*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/frac (stating that "the word ['frac'] isn't in the dictionary," and suggesting "frack" as an alternative); MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/frack ("The word *fracking* (sometimes spelled *fraccing* or *fracing*, particularly by those in the gas and oil industries) was created by shortening 'fracturing.' The addition of the 'k' brings the word into conformity with the inflected forms of similar English words ending in a vowel plus 'c,' such as *shellacking*, *panicking*, and *frolicking*."). Adopting the dictionary definition, the Court now uses "frack" except when quoting the parties.

letters stating that HOTF "received information that certain water heating contractors providing water heating services and equipment to [the companies] may be infringing the '993 Patent" and "ask[ing] that [the companies] undertake the necessary steps to ensure that any possible infringement by [their] water heating contractors or subcontractors ceases." Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66.

Hess Corporation ("Hess"), Supertherm's largest customer, received one such letter. *Id.* Hess informed Supertherm of the letter and continued to hire Supertherm to perform in-line frack water-heating jobs. *Id.* at 55, 117, 208. But Hess also hired two to three additional non-licensed vendors and gradually decreased its work with Supertherm. Pls.' App. Supp. Resp. 329, ECF No. 72. Supertherm was eager to make up the lost business, but it declined to perform jobs for new clients due to fear of potential patent-infringement litigation. *Id.* at 331. Supertherm went out of business in May of 2016, stating "[a] general business decline in that area ma[de] it impossible to justify keeping the office open." Defs.' App. Supp. Mot. Summ. J. 233, ECF No. 66.

### B. Phoenix's Purchase of HOTF and Continued Enforcement of the '993 Patent

On January 31, 2014, nearly two years after the '993 Patent issued, Phoenix acquired HOTF. *Id.* at 6. HOTF became a subsidiary of Phoenix Consolidated Oilfield Services, LLC ("Phoenix Consolidated"), which is fully owned by Phoenix. *Id.* at 2. As a Phoenix subsidiary, HOTF is a member-managed limited liability company, meaning "the Board of Directors can direct the business and affairs of, and make decisions for" HOTF. Pls.' Br. Supp. Resp. 138, ECF No. 72. Fisher has remained the head of all three companies, and he and Danny Shurden ("Shurden"), the vice president of Phoenix, are the only two remaining officers of HOTF. Defs.' App. Supp. Mot. Summ. J. 4, ECF No. 66. Thus, though "Heat On-The-Fly legally still exists, . . . it's controlled by Phoenix Services." Pls.' Br. Supp. Mot. Partial Summ. J. 11, ECF No. 62

(emphasis omitted) (quoting Pls.' App. Supp. Mot. Partial Summ. J. 132, ECF No. 63). Phoenix's, Phoenix Consolidated's, and HOTF's finances are all encompassed by a single financial statement. Pls.' App. Supp. Mot. Partial Summ. J. 177, ECF No. 72. Phoenix Consolidated funds HOTF— including by paying its attorneys' fees—because HOTF "has always been [in] a negative cash position" since the acquisition. *Id.* at 88.

Under HOTF's new structure and leadership, HOTF and Phoenix employees continued discussions about the enforcement and validity of the '993 Patent. On February 8, 2014, Fisher emailed one of HOTF's licensees to suggest "having a meeting to discuss the near future of HOTF" and assuring the licensee, "we think very highly of the value of the Patent, and plan to enforce it vigorously." Pls.' Br. Supp. Mot. Partial Summ. J. 8, ECF No. 62 (citing Pls.' App. Supp. Mot. Partial Summ. J. 58–60, ECF No. 63). He signed the email, "Mark Fisher CEO Phoenix Services, LLC." *Id.* During his deposition, Fisher stated that he would "certainly" try to capture the highest market share possible. *Id.* at 9 (quoting Pls.' App. Supp. Mot. Partial Summ. J. 61, ECF No. 63).

On March 10, 2014, a licensee complained to Fisher, Shurden, Cole, and the HOTF attorneys about several non-licensed companies infringing the '993 Patent. Pls.' App. Supp. Resp. 78, ECF No. 72. "Other heating providers . . . have no regard for the patent," the licensee wrote. *Id.* The licensee claimed its non-licensed competitors were "ruining the frac water heating business and . . . making [licensees] look like [they we]re gouging [their] customers when [they] charge[d] standard market rates." *Id.* Given the licensee was "losing work from customers who use[d non-licensed competitors]," the licensee worried that "the longer this [went] on the harder it w[ould] be to get that work back." *Id.*

The patent litigation also continued under Phoenix's ownership. On July 14, 2014, HOTF filed a counterclaim in *Newco Enterprises, LLC v. Super Heaters North Dakota, LLC*, 7:14-CV-

87-O [hereinafter *Newco*], alleging that Chandler and Newco had "been actively and knowingly inducing infringement of the 993 Patent" by their customers. Defs.' App. Supp. Mot. Summ. J. 46, ECF No. 66. On October 24, 2014, the *Energy Heating* plaintiffs sought to amend their complaint—adding, for the first time, a claim that the '993 Patent was unenforceable due to Hefley's and HOTF's inequitable conduct. *Id.* at 118–29. HOTF also added claims for patent infringement against Energy Heating and against Supertherm in December 2014. *Newco*, 7:14-CV-87-O; *Energy Heating*, 4:13-CV-10-RRE-ARS.

Even after the Federal Circuit affirmed the '993 Patent's invalidity, HOTF and Phoenix continued to assert the '993 Patent. "The website of Phoenix Services, LLC, incorporated a logo for 'Heat On The Fly®' that referred to [the '993 Patent] . . . from in or around February 2018 through approximately January 29, 2019." Pls.' App. Supp. Mot. Partial Summ. J. 27, ECF No. 72; *see also* Defs.' App. Supp. Mot. Summ. J. 149–52, ECF No. 66 (website screenshots). And the *Newco* patent-infringement claims remain stayed but pending in this Court.

## II.    LEGAL STANDARD

### A.  Summary Judgment

The Court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is not "a disfavored procedural shortcut," but rather an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of its motion and demonstrate from the record that no genuine dispute as to any material fact exists. *See Celotex*, 477 U.S. at 323. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Id.* at 250.

### B. The Sherman Antitrust Act

#### 1. <u>Standing</u>

"Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (internal citation omitted). "Although the question of causation is generally a factual question for the jury, a court should direct a verdict where the plaintiff has failed to present substantial evidence that defendant's illegal practices were a material cause of plaintiff's injuries." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 485 (5th Cir. 2000) [hereinafter *Taylor*] (internal citation omitted). "Though jury inferences

of causation are in some cases permissible, 'the required causal link must be proved as a matter of fact with a fair degree of certainty.'" *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 454 (5th Cir. 2005) [hereinafter *El Aguila*] (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978)). This is "especially so" when plaintiffs are damaged by other "salient factors distinct from the challenged conduct." *Id.*

### 2. Statute of Limitations

Under the Clayton Act's statute of limitations, an antitrust plaintiff must file its complaint within four years of the date the cause of action accrued. *See* 15 U.S.C. § 15(b); *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186 (5th Cir. 1988). The date of accrual is factual; therefore, to prevail on summary judgment, a defendant must establish there is no genuine issue regarding when the statute of limitations accrued. *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1170 (5th Cir. 1979).

The Fifth Circuit recognizes three exceptions to toll the Sherman Act's statute of limitations: (1) fraudulent concealment; (2) damages not initially ascertainable; and (3) continuing violation. *See id.*; *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982) [hereinafter *Kaiser*]. To demonstrate a defendant's fraudulent concealment, "an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that [it] failed, despite the exercise of due diligence on [its] part, to discover the facts that form the basis of [its] claim." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169. To prove that damages are not ascertainable, plaintiffs must prove that both the *existence* and the *amount* of damages are uncertain. *See Delta Produce, L.P. v. H.E. Butt Grocery Co.*, No. SA-12-CA-353, 2013 WL 12121118, at *4 (W.D. Tex. Jan. 17, 2013). And to invoke a continuing violation, a new injurious act must occur and its damages must be recoverable. *See Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321, 338 (1971) [hereinafter *Zenith*].

### 3. *Walker Process* Patent Fraud

To establish antitrust liability based on the unlawful enforcement of a patent, a claimant must either (1) "prove that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process*," or (2) "demonstrate that the infringement suit was a mere sham." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000) (internal citation omitted). The Supreme Court in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corporation*, 382 U.S. 172 (1965) established that "the enforcement of a patent procured by fraud on the Patent Office may be violative of [§] 2 of the Sherman Act." *Id.* at 174. To succeed on a *Walker Process* claim, a plaintiff must prove two elements: (1) "the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced that patent with knowledge of the fraudulent procurement" and (2) the plaintiff can satisfy "all other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). As to the first element, the Supreme Court "made clear that the invalidity of the patent [i]s not sufficient; a showing of intentional fraud in its procurement [i]s required." *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012). As to the second, "the Court incorporated the rules of antitrust law generally. As Justice Harlan stated in his concurring opinion, 'as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play.'" *Id.* (citing *Walker Process*, 382 U.S. at 180 (Harlan, J., concurring)).

Under § 2 of the Sherman Act, a defendant may be liable for monopolization, attempt to monopolize, or conspiracy to monopolize. 15 U.S.C. § 2. When the plaintiff alleges monopolization, a court must "focus on the harm done, in the form of a monopolization which the defendant willfully creates or maintains," but when a plaintiff alleges attempted monopolization,

the court must instead "focus on the harm that potentially *might* have been caused by the conduct in light of the state of the market." *Taylor*, 216 F.3d at 474 (emphasis added). "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "The first element considers the conduct, the second looks to the motivation behind the conduct, and the third looks to the defendant's market power and commensurate ability to lessen or destroy competition in that market." *Taylor*, 216 F.3d at 474 (internal citation omitted). When the third, "dangerous probability" element is at issue, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.

4. <u>Sham Patent Litigation</u>

A plaintiff may also base its claim for antitrust liability on an allegation that defendant engaged in sham patent litigation. *Cf. Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*, 762 F.3d 1338, 1343 (Fed. Cir. 2014) (noting that while, "[a] party is ordinarily exempt from antitrust liability for bringing a lawsuit against a competitor . . . [t]here is a recognized exception . . . for 'sham litigation'" (internal citation omitted)). Indeed, antitrust law precludes a purported patent owner from "bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed" when "the litigation is conducted for anti-competitive purposes." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed Cir. 1998). In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* (*PRE*), 508 U.S. 49 (1993), the Supreme Court established the two-part test for "sham" litigation: "(1) the lawsuit must be objectively meritless such that 'no reasonable litigant could expect success on the merits' and (2) it must be found that 'the baseless

lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor."'" *C.R. Bard*, 157 F.3d at 1368 (quoting *PRE*, 508 U.S. at 60). Because "[f]raud in the procurement of a patent is governed by *Walker Process* . . . the complainant 'must still prove a substantive antitrust violation.'" *Id.* (quoting *PRE*, 508 U.S. at 61).

## III.   ANALYSIS

### A.  Standing

The Chandler Plaintiffs have failed to present substantial evidence that HOTF's or the Phoenix Defendants' own alleged antitrust violations were a material cause of Supertherm's business losses. Accordingly, they do not have standing to pursue their *Walker Process* and sham litigation claims for lost-profit damages.

"Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Sanger Ins. Agency*, 802 F.3d at 737 (internal citation omitted). The Phoenix Defendants raise only the first issue, claiming the Chandler Plaintiffs cannot prove that HOTF's unlawful conduct caused Supertherm to gradually lose business from its largest customer and eventually go out of business.

"Although the question of causation is generally a factual question for the jury, a court should direct a verdict where the plaintiff has failed to present substantial evidence that the defendant's illegal practices were a material cause of plaintiff's injuries." *Taylor*, 216 F.3d at 485 (internal citation omitted); *see also H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978) ("To succeed, an antitrust plaintiff must show the defendants' wrongful actions materially contributed to an injury to the plaintiff's business, and must provide some indication of the amount of damage done."). In some instances, the jury can infer facts to establish causation,

but "the required causal link must be proved as a matter of fact with a fair degree of certainty." *Blue Bird Body Co.*, 573 F.2d at 317. This is "especially so" when plaintiffs are damaged by other "salient factors distinct from the challenged conduct." *El Aguila*, 131 F. App'x at 454 (requiring more when there was "increased competition" and the plaintiffs refused to mitigate damages); *see also Taylor*, 216 F.2d at 485 (holding that the plaintiff "had to establish a tighter connection between the behavior and the damages" because the plaintiff "concededly also lost customers (i.e., suffered damage)" for reasons unrelated to the antitrust violation). And "[w]hen the fact of injury is in issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." *H&B*, 577 F.2d at 247 (internal citation omitted).

In September 2013, HOTF sent a cease-and-desist letter to Hess, implying that Supertherm, its only in-line frack water-heating provider, was violating the '993 Patent. Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66. Hess immediately told Supertherm about the cease-and-desist letter; but following a brief conversation, Hess and the Chandler Plaintiffs never again discussed the letter or the '993 Patent. *Id.* at 55–69, 207–08. Over the next three years, Hess gradually reduced its work with Supertherm and hired other non-licensed vendors to complete some of its frack jobs. Pls.' App. Supp. Resp. 326–31, ECF No. 72. But Hess never hired HOTF or any of its licensees. Defs.' App. Supp. Mot. Summ. J. 147, ECF No. 66. Supertherm "tr[ied] to replace the business from Amerada Hess with other customers," but due to the cease-and-desist letter to Hess and pending lawsuits against other non-licensed companies, Supertherm was "'scared' and 'hiding in the shadows.'" Pls.' Br. Supp. Resp. 21, ECF No. 71 (citing Pls.' App. Supp. Resp. 326–27, 330–31, ECF No. 72). This fear allegedly led Supertherm to decline business from other prospective in-line fracking customers. *Id.*

After the District of North Dakota concluded that the '993 Patent was unenforceable due to inequitable conduct, neither Supertherm nor the other Chandler Plaintiffs reached out to Hess to ask for more work. Defs.' App. Supp. Mot. Summ. J. 66–67, ECF No. 66. And by the end of 2015 and beginning of 2016, the market for oil bottomed out. *See id.* at 58, 217–18, 224–25, 231–32. In 2016, Supertherm ceased operations and sent out a memorandum stating that it was shutting down due to lack of business in the field. *Id.* at 57, 233.

The Chandler Plaintiffs provide evidence that HOTF sent Hess a cease-and-desist letter in 2013 and that Supertherm went out of business in 2016, but they do not provide evidence of any "causal link." *Blue Bird Body Co.*, 573 F.2d at 317. If Hess was in fact influenced by the cease-and-desist letter, it would have stopped working with Supertherm and instead hired HOTF or a licensee authorized to use the patented process. It did neither. Instead, it defied HOTF's instructions—continuing to work with Supertherm and hiring other non-licensed vendors. Moreover, though Supertherm's manager testified he was scared to complete fracking projects for new customers, a plaintiff's deposition testimony cannot be the sole piece of "substantial evidence." *See H&B*, 577 F.2d at 247 (internal citation omitted) ("When the fact of injury is at issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely."). Because Supertherm was also damaged by "salient factors distinct from the challenged conduct," *El Aguila*, 131 F. App'x at 454—namely, the fluctuating oil market and increase in competition among non-licensed fracking providers— the Chandler Plaintiffs must "establish a tighter connection between the behavior and the damages," *Taylor*, 216 F.2d at 485. Viewing the evidence in the light most favorable to the Chandler Plaintiffs, they are unable to establish the necessary causal connection.

Without proving HOTF's cease-and-desist letter caused Supertherm's monetary damages, the Chandler Plaintiffs cannot satisfy the standing elements with regard to their claims for lost profits. Accordingly, the Court holds that the Chandler Plaintiffs lack standing to pursue these claims. Nevertheless, the Chandler Plaintiffs do have standing to pursue their *Walker Process* and sham patent litigation claims for fees expended in defending against HOTF's patent-infringement claims.

## B. Statute of Limitations

Pursuant to the Clayton Act's four-year statute of limitations, the Chandler Plaintiffs must present evidence sufficient to prove either (1) a specific injurious act occurred within four years of the suit's inception or (2) an exception applies to toll the limitations period. *See* 15 U.S.C. § 15(b); *Bell*, 847 F.2d at 1186. At the summary-judgment stage, the Phoenix Defendants must prove there is no genuine issue of material fact regarding the date of accrual. *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1170. If the Phoenix Defendants meet this initial burden, the burden shifts to the Chandler Plaintiffs to establish the applicability of a tolling doctrine. *See id.* Because the Chandler Plaintiffs' filed this suit on January 29, 2019, they must present evidence of a specific injurious act that the Phoenix Defendants or HOTF took on or after January 29, 2015. The Phoenix Defendants have established that the only two allegedly injurious acts occurred outside the limitations period, and the Chandler Plaintiffs have not established that an exception tolls the limitations period. Thus, the Chandler Plaintiffs' *Walker Process* fraud and sham patent litigation claims are barred as untimely.

### 1. Acts Within the Limitations Period

In their First Amended Complaint, the Chandler Plaintiffs pleaded three allegedly injurious acts: (1) HOTF's sending a cease-and-desist letter to Supertherm's largest customer, (2) HOTF's

assertion of patent-infringement claims against the Chandler Plaintiffs, and (3) Phoenix's advertisement of the '993 Patent on its website. The first two actions occurred outside the limitations period, and the third is not actionable.

On September 13, 2013, HOTF sent Hess a cease-and-desist letter, ordering the company to "undertake the necessary steps to ensure that any possible infringement by [its] water heating contractors or subcontractors ceases." Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66. HOTF sent this letter—as well as the cease-and-desist letters to the other sixteen non-licensed vendors— more than four years before the Chandler Plaintiffs filed this suit. *Id.* at 80–113. "[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *TCA Bldg. Co. Nw. Res. Co.*, 861 F. Supp. 1366, 1377 (S.D. Tex. 1994) (quoting *Poster Exch. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975)). In this case, though the Chandler Plaintiffs allege the letter continued to harm Supertherm, the gradual decline in work is merely an "inertial consequence." *Id.* The injurious action itself occurred on September 13, 2013, when Hess received the letter and began decreasing its business to Supertherm.

Then, on July 18, 2014, HOTF filed patent-infringement claims against Newco and Chandler. Defs.' App. Supp. Mot. Summ. J. 46–47, ECF No. 66. HOTF added a claim against Supertherm on December 22, 2014. *Newco*, 7:14-CV-87-O. "Any injury . . . resulting from the continued prosecution [of the lawsuit] relates back to the initial decision to file." *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274 (5th Cir. 1991) (internal citation omitted); *see also Internet Corporativo S.A. de C.V. v. Bus. Software All., Inc.*, No. Civ.A.H-04-2322, 2004 WL 3331843, at *5 ("The Fifth Circuit has specifically addressed the accrual of a cause of action based on allegations that the filing and prosecution of litigation violated the antitrust laws, rejecting the

application of the continuing violation exception." (citing *Al George*, 939 F.2d 1271)). Thus, any injuries stemming from the litigation occurred on July 18, 2014 and December 22, 2014, when HOTF filed the patent-infringement claims against the Chandler Plaintiffs.

Finally, from January 2018 to January 2019, the Phoenix Defendants posted the HOTF logo in association with the '993 Patent on the Phoenix website. Pls.' App. Supp. Resp. 27, ECF No. 72. Unlike the first two actions, this action did occur within the limitations period. However, the Chandler Plaintiffs present no claim nor other evidence showing they were injured by the website. Rather, Supertherm CFO and the Chandler Plaintiffs' Rule 30(b)(6) designee Reanna Chandler Jones admitted that the Chandler Plaintiffs were *not* injured by the Phoenix Defendants' website. Defs.' App. Supp. Mot. Summ. J. 49–51, ECF No. 66. Because the action did not injure any plaintiff, it too may not be used as a specific act for purposes of the statute of limitations. *See Rx.com v. Medco Health Sol., Inc.*, 322 F. App'x 394, 396 (5th Cir. 2009).

### 2.  Tolling the Limitations Period

Both alleged injuries occurred outside the limitations period, so the Chandler Plaintiffs must show that one of three exceptions applies to toll the statute of limitations. The Chandler Plaintiffs argue that each of the Fifth Circuit's three exceptions applies: (1) fraudulent concealment; (2) damages not initially ascertainable; and (3) continuing violation. Pls.' Br. Supp. Resp. 1–26, ECF No. 71 (citing *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169; *Kaiser*, 677 F.2d at 1051). Each argument fails.

#### a.  *Fraudulent Concealment*

"Fraudulent concealment tolls the Clayton Act's statute of limitations." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169. To avail itself of the fraudulent-concealment exception, "an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that [it]

failed, despite the exercise of due diligence on [its] part, to discover the facts that form the basis of [its] claim." *Id.* The Chandler Plaintiffs may be able to prove that the Phoenix Defendants actively concealed HOTF's conduct, but the Chandler Plaintiffs cannot prove that they did not discover the facts that form the basis of their claims.

The Phoenix Defendants argue that the Chandler Plaintiffs may not raise the fraudulent-concealment argument because they did not plead the defense nor facts to support application of the defense. Defs.' Br. Supp. Mot. Summ. J. 8, ECF No. 65. The Chandler Plaintiffs need not have pleaded the defense, but they did need to plead the fraudulent facts with particularity. *See* FED. R. CIV. P. 9(b); *Colonial Penn. Ins. Co. v. Market Planners Ins. Agency*, 1 F.3d 374, 376 & n.2 (5th Cir. 1993); *Tangela Levels v. Merlino*, 969 F. Supp. 2d 704, 721 (N.D. Tex. 2013). The Chandler Plaintiffs only pleaded two relevant and potentially fraudulent facts with particularity: (1) the '993 Patent inventor's failure to "disclose any of the 61 frac jobs to the Patent Trademark Office ('PTO') during prosecution as potential on-sale or public uses of the invention that might have triggered the on-sale bar," and (2) HOTF's threatening of the Chandler Plaintiffs' customers via cease-and-desist letters. First Am. Compl. ¶¶ 12, 14, ECF No. 23.

The Chandler Plaintiffs argue that the Federal Circuit's holding that "the '993 Patent is unenforceable due to inequitable conduct, and that the infringement claim was asserted in bad faith . . . is ample evidence of acts by Defendants to conceal this *antitrust* cause of action, not merely an action based on inequitable conduct." Pls.' Br. Supp. Resp. 8, ECF No. 71. They also argue "there is further documentary evidence that the fraudulent nature of the patent prosecution and the subsequent enforcement of the '993 Patent was expressly concealed by HOTF and its lawyers." *Id.* The record evidence does suggest HOTF and its attorneys knew of and actively concealed the prior use from the USPTO. *See* Pls.' App. Supp. Resp. 16–18, 21, 24, 573–81, 588–91, 597, ECF

No. 72. And though the Phoenix Defendants differentiate between concealment from plaintiffs and concealment from third parties, Defs.' Reply 3, ECF No. 74, Fifth Circuit case law does not make this distinction. *See, e.g., State of Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988) [hereinafter *Allan Construction*] (discussing affirmative acts of fraudulent concealment generally, not just as to the plaintiffs). Thus, a jury could find that this act constitutes an "affirmative act[] of concealment." *Id.* (internal citation omitted).

However, the Chandler Plaintiffs cannot show that they did not and could not discover the actionable conduct through due diligence. Throughout the litigation, the Chandler Plaintiffs' counsel was in regular communication with patent-plaintiff Energy Heating's counsel. *See* Defs.' App. Supp. Mot. Summ. J. 131, ECF No. 66 (stating Energy Heating's counsel "was involved in very similar litigation and so it was helpful to talk to him about what he was experiencing in that litigation."). "Plaintiffs' privilege log shows extensive communications with Energy Heating's counsel," including "53 emails alone starting in starting in early September, right before Energy Heating sought to amend its complaint." Defs.' Br. Supp. Mot. Summ. J. 9–10, ECF No. 65 (internal emphasis omitted) (citing Defs.' App. Supp. Mot. Summ. J. 132–33, ECF No. 66).

On December 4, 2014, Energy Heating amended its complaint to add the inequitable-conduct claim. It listed "[s]pecific invalidating prior art public use and on-sale projects" as its invalidity contentions. *Id.* at 10 (quoting Defs.' App. Supp. Mot. Summ. J. 136, ECF No. 66). Given the Chandler Plaintiffs' knowledge of the *Energy Heating* litigation and their interactions with counsel, the Chandler Plaintiffs are presumed to be aware of the contents of the amended complaint and, therefore, aware of the actionable conduct. *Cf. Allan Constr.*, 851 F.2d at 1533 (presuming the plaintiffs had knowledge of the basis for claims asserted in "a nearly identical antitrust claim against the same defendants[, which] had been filed several years earlier in

California"). But even without the presumption of knowledge, the Chandler Plaintiffs would be unable to invoke the fraudulent-concealment exception because they have not and cannot prove they "failed, *despite the exercise of due diligence* on [their] part, to discover the facts that form the basis of [their] claim[s]." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169 (emphasis added).

Moreover, were the Court to accept the Chandler Plaintiffs' contention that they were unaware of the actionable conduct until the District of North Dakota issued its inequitable-conduct ruling, a key concession would still undercut their fraudulent-concealment argument. In their Response to the Phoenix Defendants' Motion for Summary Judgment, the Chandler Plaintiffs state they "*agree* with Defendants that actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants . . . until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71 (emphasis in original). If the Phoenix Defendants did not know of their actionable conduct until the district court found it unlawful, they would not have the ability to fraudulently conceal it.

Finally, within their fraudulent-concealment argument, the Chandler Plaintiffs make two arguments based on fairness. First, they contend "[t]here is at least a triable issue of fact as to the reasonableness of tolling the statute of limitations as to Plaintiffs based on fraudulent concealment to further investigate a complex antitrust claim based on *Walker Process* fraud and sham litigation." *Id.* at 16. The Chandler Plaintiffs note they filed suit on January 29, 2019—only four years and about five weeks after HOTF filed the patent-infringement suit—and they argue a jury should consider whether Supertherm, "an unsophisticated 'Mom and Pop' family-run oilfield manufacturing and services business in Wichita Falls, Texas . . . exercised sufficient due diligence as to both the *Walker Process* patent fraud claim and the sham patent litigation claim." *Id.* But they do not cite a single case in support of this argument, and they do not tie "reasonableness" to fraud.

The Chandler Plaintiffs also argue that "[a]dequate notice to Plaintiffs of facts necessary to support an *antitrust* claim is a far more complex issue than even just the already complex issue of an inequitable conduct counterclaim." *Id.* (emphasis in original). They discuss details about the market share covered by the '993 Patent, which they did not discover until 2016. *See id.* at 17–19. But this argument also fails for two reasons. First, there is no indication that the Phoenix Defendants "fraudulently concealed" details regarding their engagement with the market or market power. And second, even if they did, the Chandler Plaintiffs did not plead this at all—much less with the particularity required under Rule 9(b). *See generally* First Am. Compl., ECF No. 23

Each of the Chandler Plaintiffs' arguments regarding fraudulent concealment is unavailing. Thus, this exception does not toll the statute of limitations.

### b. *Damages Not Yet Ascertainable*

The Chandler Plaintiffs also contend the statute of limitations should be tolled because their damages were not ascertainable when HOTF sent Plaintiff Supertherm its cease-and-desist letter and when HOTF filed its patent-infringement claims against the Chandler Plaintiffs. *See* Pls.' Br. Supp. Resp. 20–22, ECF No. 71. They argue "Supertherm's damage claim thus did not accrue until the damages could be ascertained, which began in May, 2016 with the failure of the business." *Id.* at 22. But while Supertherm could not have known the exact amount of lost profits, it did know of their existence.

Antitrust plaintiffs may recover both past and future damages. *See Zenith*, 401 U.S. at 338. "The fact that the act may inflict damages in the future, as opposed to at the time the acts are committed, does not prevent the cause of action from accruing." *Astoria Entm't, Inc. v. Edwards*, 159 F. Supp. 2d 303, 316 (E.D. La. 2001) (quoting Julian O. van Kalinowski, Peter Sullivan & Maureen McGuirl, 8 ANTITRUST LAWS AND TRADE, § 162.02[1], at 162–5 (citations omitted)).

Rather, to prove that damages are not ascertainable, plaintiffs must prove that both the *existence* and the *amount* of damages are uncertain. *See Delta Produce, L.P.*, 2013 WL 12121118, at *4.

The Chandler Plaintiffs knew they were financially damaged as soon as Hess reduced its business with Supertherm. Thus, they knew damages existed well before January 2015, even if they did not yet know the monetary amount. In *Delta Produce*, the Western District of Texas considered nearly identical facts and concluded the damages-not-initially-ascertainable exception did not apply. 2013 WL 12121118, at *4 ("While the amount of damages may have been speculative, the injury itself, assuming Delta's allegations are true, was not. Delta alleges that it first sustained injury in 2002, when it was prevented from selling products to an HEB competitor. Thus, Delta's cause of action under Section One of the Sherman Act is barred by limitations."). The Phoenix Defendants argue this Court should do the same, as "[u]nder Plaintiffs' theory, if Supertherm has never gone out of business, Plaintiffs could wait to file suit indefinitely, always alleging that their damages were 'not ascertainable' because its business was ongoing." Defs.' Reply 10–11, ECF No. 74.

The Court finds the *Delta Produce* court's holding and the Phoenix Defendants' reasoning persuasive. Accordingly, the damages-not-yet-ascertainable exception does not apply.

c. *Continuing Violation*

Finally, the Chandler Plaintiffs also argue the continuing-violation exception applies. They state that "[t]he key question is whether some injurious act actually occurred during the limitations period." Pls.' Br. Supp. Resp. 22, ECF No. 71 (quoting *Eurotec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.*, No. 3:15-CV-3454, at *14 (N.D. Tex. Aug. 1, 2019) (emphasis omitted)). And they contend "[t]he answer to this question for purposes of HOTF's conduct is 'yes' for two reasons: (1) HOTF filed a Response to the USPTO on April 13, 2015 in a

reexamination proceeding . . . and (2) in February, 2018 through January 29, 2019, Defendant Phoenix Services modified its website to reference the '993 Patent and offer licensing." *Id.* at 22–23. However, these acts do not constitute continuing violations.

There are two restrictions to the continuing-violation exception, both of which foreclose its application here. First, the act must actually injure the plaintiffs. *See Edwards*, 159 F. Supp. 2d at 316 ("The key to this exception is that plaintiff itself, not some other third party, was injured by the continuing conspiratorial conduct."). Second, plaintiffs can only recover damages caused by the new act; the new act does not revive old damages occurring before the limitations period. *See Zenith*, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws, . . . each time  plaintiff is injured by an act of the defendants, a cause of action accrues to him to recover those damages *caused by that act* and that, as to *those* damages, the statute of limitations runs from the commission of the act." (emphasis added)).

The Chandler Plaintiffs pleaded three allegedly injurious acts: (1) HOTF's sending the cease-and-desist letter to Hess, (2) HOTF filing patent-infringement claims against the Chandler Plaintiffs, and (3) Phoenix advertising the '993 Patent on its website. *See* Am. Compl. ¶¶ 14, 15, 19, ECF No. 23. As discussed, the first two indisputably occurred before the limitations period and the Chandler Plaintiffs were not injured by the third. *See supra* Section III.B.1. The only potentially injurious act occurring within the limitations period is HOTF's response to the USPTO. But the Chandler Plaintiffs did not plead the response in their Amended Complaint. *See generally* First Am. Compl., ECF No. 23. In fact, "[t]his is a brand new allegation." Defs.' Reply 14, ECF No. 74. And regardless, "[t]here is no evidence . . . that this document caused any injury to the Plaintiffs. None of the Plaintiffs' deposition witnesses cited the reexamination as causing injury to the Plaintiffs, instead pointing solely [to] the cease and desist letter and litigation filings." *Id.* So,

even if the Court did find that the response constituted a violation, it could not revive the actual damages—all of which allegedly stem from the cease-and-desist letter and patent-infringement claims. *See Zenith*, 401 U.S. at 338.

Thus, the continuing-violation exception also does not apply to toll the statute of limitations. Because none of the three exceptions applies, the Sherman Act's four-year statute of limitations bars the Chandler Plaintiffs *Walker Process* fraud and sham patent litigation claims.

### C. The Phoenix Defendants' Liability for HOTF's Conduct

Even if the Chandler Plaintiffs had standing and their claims were not barred by the statute of limitations, the Court would grant summary judgment in favor of the Phoenix Defendants because neither Phoenix nor Fisher may be held liable for HOTF's alleged antitrust violations. The Chandler Plaintiffs admit that they "*agree* with Defendants that actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants . . . until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71 (emphasis in original). Given this concession, Phoenix and Fisher cannot be held liable under the applicable single-enterprise and the corporate-officer standards of liability.

#### 1. Single-Enterprise Liability

Whether a parent may be liable for the attempted monopolization of its subsidiary is an issue of first impression in the Fifth Circuit. Accordingly, the Court looks to the single-enterprise-liability standard advanced by the Ninth Circuit and the Tenth Circuit—the only two federal circuits to have addressed the issue. *Arandell Corp. v. Centerpoint Energy Servs.*, 900 F.3d 623 (9th Cir. 2018); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017) [hereinafter *Lenox*]. The Court finds the *Arandell Corp.* and *Lenox* opinions persuasive and,

in adopting their approach, concludes that Phoenix may not be held liable for HOTF's allegedly anticompetitive conduct.

Both circuits' opinions rely on the Supreme Court's opinion in *Copperweld Corporation v. Independence Tube Corporation*, 467 U.S. 752 (1984). In *Copperweld*, the Supreme Court concluded that a parent cannot conspire with its subsidiary in violation of § 1 of the Sherman Act. *Id.* at 771–72. The Supreme Court reasoned:

> [T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.

*Id.* "For these reasons, the Court held that 'the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise.'" *Lenox*, 847 F.3d at 1233 (quoting *Copperweld*, 467 U.S. at 771). In the context of conspiracy claims, several courts have "held that affiliated entities which must be treated as a single enterprise for purposes of § 1 also must be treated as a single enterprise for purposes of § 2." *Id.* at 1235 (collecting cases).

The Tenth Circuit was the first circuit court to address whether *Copperweld*'s reasoning also applies to § 2 Sherman Act claims for monopolization or attempted monopolization. *See generally id.* "[A]lthough *Copperweld* did not expressly reach this issue, [the Tenth Circuit] conclude[d] *Copperweld*'s reasoning necessarily denounces [the defendants'] belief that [the plaintiff] could directly establish its non-conspiracy § 2 claims only by proving that '*specific* Defendants' independently satisfied each necessary element of the claims." *Id.* at 1236 (emphasis in original). Rather, the court reasoned, "in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that

24

matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim." *Id.* (emphasis in original) (citing 7 Phillip E. Arreda & Herbert Hovencamp, *Antitrust Law* ¶ 1464g, at 227 (3d ed. 2008) ("[A] single entity can violate § 2 if the prerequisites of monopolization or attempted monopolization are met.")). "To hold otherwise—to require that each affiliated defendant independently satisfy every element in order to be held liable—would be difficult to justify . . . in part because the enterprise they form 'is fully subject to § 2 of the Sherman Act.'" *Id.* (quoting *Copperweld*, 467 U.S. at 776–77). And rejection of the single-enterprise theory "would all but eviscerate the statute with respect to sophisticated competitors," like Phoenix. *Id.* "So long as a corporation spreads its anticompetitive scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability, it could unlawfully monopolize with impunity." *Id.* The Tenth Circuit says "*Copperweld* forecloses this result." *Id.*

The Ninth Circuit became the second circuit to address the issue, and it agreed with the Tenth Circuit's interpretation of *Copperweld*. *See Arandell Corp.*, 900 F.3d 623 (Bea, J.). The Ninth Circuit noted that "Supreme Court precedent establishes that 'a parent and a wholly owned subsidiary *always* have a "unity of purpose"' and thus act as a 'single enterprise' whenever they engage in 'coordinated activity.'" *Id.* at 625 (citing *Copperweld*, 467 U.S. 752). The court further reasoned that "[i]t would be inconsistent to insist" that, though the parent and subsidiary "'always' share a 'unity of purpose,'" one can nevertheless escape liability "by disavowing the anticompetitive intent of the other, even where the two acted together." *Id.* at 631–32. Accordingly, Judge Bea, writing for the unanimous panel, concluded that "*Copperweld* supports the following rule: A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in

such coordinated activity with the purpose of the single 'economic unit' of which it is a part." *Id.* at 632.

The Phoenix Defendants do not address *Copperweld, Lenox,* or *Arandell Corp.*. Rather, they claim that "[b]ecause the Fifth Circuit has not recognized a single enterprise theory of antitrust liability, the Plaintiffs' claims against Phoenix are not viable." Defs.' Br. Supp. Resp. 5, ECF No. 68. And they reference, without explanation, the Texas Supreme Court's rejection of the theory in the context of tort claims. *Id.* (citing *SSP Partners v. Gladstrong Invest. (USA) Corp.*, 275 S.W.3d 444 (Tex. 2008)). Given that both *Walker Process* and sham patent litigation are federal claims, and that the only two federal circuits to review the issue have endorsed the single-enterprise theory under like circumstances, the Phoenix Defendants' reliance on a state supreme court provides a weak refutation. Thus, the Court follows the Ninth and Tenth Circuit's lead and applies the single-enterprise theory of liability.

But the Court must also determine how to apply this theory—an issue that the appellate courts did not resolve. It is well established that a parent cannot be held liable for the anticompetitive conduct of its subsidiary "merely by virtue of its place in the same corporate family." *Lenox*, 847 F.3d at 1237. Indeed, "*Copperweld* 'held that only "the coordinated activity" of [related entities] must be viewed as that of a single enterprise.'" *Id.* (quoting *Copperweld*, 467 U.S. at 771). Thus, a plaintiff is "still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise." *Id.* But how involved must the parent-defendant be?

In *Lenox*, after observing that no circuit had "provided a clear answer to the question of what level of involvement is sufficient to meet that burden," the Tenth Circuit looked to two district court cases, in which the courts concluded that, "[w]hen the parent controls, dictates or encourages

the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act." *Id.* at 1237–38 (quoting *Climax Molybdenum Co. v. Molychem, LLC*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005) (quoting *Nobody in Particular Presents, Inc. v. Clear Channels Comm'cns, Inc.*, 311 F. Supp. 2d 1048, 1071 (D. Colo. 2004) [hereinafter *Nobody in Particular*])). Because the Tenth Circuit could resolve the issue on other grounds, it left the issue's "resolution for another day . . . [and] express[ed] no opinion" on the test. *Id.* at 1239. Given this is still "uncharted territory at the federal circuit level," the Court applies the Colorado district courts' "control, dictates or encourages" test. *Id.* (internal citations omitted).

This brings the Court back to the Chandler Plaintiffs' concession, that "actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants . . . until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71. The Chandler Plaintiffs argue that HOTF's inequitable conduct also satisfies the first two Sherman Act elements. Pls.' Br. Supp. Mot. Partial Summ. J. 4–5, ECF No. 62 (citing *TransWeb, LLC*, 812 F.3d at 1307). The Phoenix Defendants concede that when "the party that engaged in inequitable conduct is the same party that subsequently asserts the patent, it makes sense to hold that the inequitable conduct finding also established the 'anticompetitive conduct' and 'specific intent to monopolize' requirements." Defs.' Br. Supp. Resp. 19, ECF No. 68. Here, however, HOTF engaged in the inequitable conduct, but the Chandler Plaintiffs intend to hold Phoenix liable for asserting the patent.

To be liable for its subsidiary's conduct, a parent must engage in "coordinated activity," *Copperweld*, 467 U.S. at 771, to "purposely advance the very same scheme . . . for an illegal, anticompetitive purpose," *Arandell Corp.*, 900 F.3d at 631. Without knowledge that HOTF was

engaging in inequitable conduct when it sent the seventeen cease-and-desist letters and filed several patent-infringement claims against non-licensed competitors, Phoenix could not have purposely "control[led], dictate[d] or encourage[d]" HOTF's anticompetitive conduct by continuing to enforce the '993 Patent. *Nobody in Particular*, 311 F. Supp. 2d at 1071. *Contra id.* at 1069 ("To conclude that a parent can direct and require anticompetitive conduct of its subsidiaries, like any principal directing the conduct of an agent, and then escape antitrust liability by hiding behind the separate corporation is counterintuitive."). And the Chandler Plaintiffs provide no evidence that Phoenix shared HOTF's "intention of monopolizing the relevant market." *Climax Molybdenum Co.*, 414 F. Supp. 2d at 1013. Thus, given Phoenix's lack of knowledge, intent, and involvement in HOTF's injurious acts, Phoenix may not be held liable as part of a single enterprise.

### 2. Individual Liability

For similar reasons, Fisher also cannot be held liable for HOTF's anticompetitive conduct. In its Memorandum Opinion and Order denying Defendants' Motion to Dismiss, the Court addressed the issue of Fisher's potential individual liability. *Chandler*, 419 F. Supp. 3d at 986–89. There, the Court applied the reasoning from *MVConnect, LLC v. Recovery Database Network, Inc.*, No. 3:10-CV-1948, 2011 WL 13128799 (N.D. Tex. May 27, 2011). In *MVConnect*, this Court held that "a corporate officer or director can be held personally liable for damages arising out of an anti-trust violation where he participated in the unlawful acts, or where he acquiesced or ratified the actions of other officers or agents of the corporation which were in violation of the anti-trust law." *Id.* at *10. The "essential principle" necessary to hold a director or officer individually liable for a company's alleged violation is the director's or officer's "direct, personal participation." *Id.* Accordingly, to survive a motion to dismiss a claim for individual liability based on an antitrust

violation, a plaintiff must plead "factual allegations of some sort of conscious wrongdoing by [an] officer on the corporation's behalf" and that the officer had "some direct role" in the alleged violation. *Id.* at *9 (citing *In re Morrison*, 555 F.3d 473, 481 (5th Cir. 2009); *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)).

Applying this standard at the Rule 12(b)(6) stage, the Court the found that "the Chandler Plaintiffs ha[d] pleaded facts sufficient to allege that Fisher had a direct role in the attempted monopolization and a specific intent to monopolize the in-line frac water-heating market." *Chandler*, 419 F. Supp. 3d at 988. But this only applied to Fisher's actions on behalf of HOTF. *See id.* at 988–89. Though the Chandler Plaintiffs also contended that Fisher should be held liable for his acts on behalf of Phoenix, the Court dismissed the claim because the Chandler Plaintiffs presented only a "mere suggestion of what Fisher *likely knew* or *should have known*—not a factual allegation regarding his 'direct role.'" *Id.* (emphasis in original) (quoting *MVConnect*, 2011 WL 13128799, at *9).

Now, at the Rule 56 stage, the Court must consider whether the summary-judgment evidence creates a genuine issue of fact regarding whether Fisher had a direct role in HOTF's attempted monopolization. The Chandler Plaintiffs claim there is "no genuine issue of material fact that Mark Fisher had the requisite 'direct role' and 'conscious wrongdoing' in the enforcement of the '993 Patent against Plaintiff Supertherm as an attempted monopolization." Pls.' Br. Supp. Mot. Partial Summ. J. 25, ECF No. 62. The Phoenix Defendants respond that "there is substantial evidence in the record that Fisher did not know or have reason to know when he authorized the patent infringement claims against Plaintiffs that the '993 Patent was unenforceable due to inequitable conduct." Defs.' Br. Supp. Resp. 24, ECF No. 68.

Just as the Chandler Plaintiffs' concession that the Phoenix Defendants did not have "actual notice of facts to support a *Walker Process* fraud claim . . . until January 2016 when the District Court made its inequitable conduct finding" negates Phoenix's corporate liability, it also negates Fisher's individual liability for his actions on behalf of HOTF. Pls.' Br. Supp. Resp. 15, ECF No. 71. The Chandler Plaintiffs list several ways in which Fisher participated in the enforcement of the '993 Patent after Phoenix acquired HOTF. *See* Pls.' Br. Supp. Mot. Partial Summ. J. 23–25, ECF No. 62. But given that the only two potentially injurious actions—HOTF's sending Hess a cease-and-desist letter and HOTF suing the Chandler Plaintiffs for patent infringement—occurred before the District of North Dakota's ruling, Fisher did not previously have the requisite knowledge to engage in "conscious wrongdoing." *MVConnect*, 2011 WL 13128799, at *9. Arguably, Fisher could have consciously engaged in continuing the *Newco* litigation on behalf of HOTF, but given that the case has been stayed since 2015, the Chandler Plaintiffs should not have expended fees on litigation since the District of North Dakota's ruling. *See* 7:14-CV-87-O. Accordingly, because Fisher also did not have the requisite knowledge, intent, and direct involvement in HOTF's alleged anticompetitive injurious acts, Fisher also cannot be held liable for his role as an HOTF corporate officer.

## IV.     CONCLUSION

Due to the Chandler Plaintiffs' lack of standing to bring antitrust claims for lost-profit damages, failure to file suit within the four-year limitations period, and inability to establish Phoenix's corporate liability and Fisher's individual liability, the Chandler Plaintiffs may not proceed on the merits of their *Walker Process* and sham patent litigation claims. Accordingly, the Court **DENIES** the Chandler Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** the

Phoenix Defendants' Motion for Summary Judgment. The Chandler Plaintiffs' claims are **DISMISSED with prejudice.**

**SO ORDERED** on this **13th day** of **April, 2020**.

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**